UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUAN P. MOLINA,                                    :

              Plaintiff,              :              13 Civ. 4989 (AJP)

        -against-                           :              **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of Social     :
Security,
                              :
              Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

          Pro se plaintiff Juan Molina brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security (the "Commissioner") denying him Supplemental Security Income ("SSI") benefits.  (Dkt.

No. 4: Am. Compl.)  Presently before the Court is the Commissioner's motion for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 20: Notice of Motion.)  The parties have

consented to my decision of this case pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 22: Consent to

Magistrate Judge Jurisdiction.)

          For the reasons set forth below, the Commissioner's motion (Dkt. No. 20) is <u>DENIED</u>

and the case remanded to the Commissioner for further proceedings consistent with this Opinion.

**FACTS**

**Procedural Background**

          On March 21, 2011, Molina applied for SSI benefits, alleging that he was disabled

since November 1, 2010.  (Dkt. No. 11: Admin. Record filed by the Comm'r ("R.") 54, 100, 132.)

Molina alleged disability due to depression, a "mental condition," seizures, headaches, asthma and

scoliosis.  (R. 136; see also Dkt. No. 4: Am. Compl. ¶ 4.)  On June 7, 2011, the Social Security

Administration ("SSA") found Molina not disabled and denied his applications.  (R. 53-58.)  On

June 30, 2011, Molina requested an administrative hearing.  (R. 59-60.)

Administrative Law Judge ("ALJ") Eric W. Borda conducted the administrative

hearing on March 14, 2012, at which Molina appeared with a non-attorney representative.  (R. 25-

52.)  ALJ Borda heard testimony from Molina and vocational expert Karen Simone.  (R. 30-52.)

On April 24, 2012, ALJ Borda found Molina not disabled.  (R. 9-21.)  ALJ Borda's decision became

the Commissioner's final decision when the Appeals Council denied Molina's request for review on

June 14, 2013.  (R. 1-4.)

**Non-Medical Evidence**

Molina, born May 31, 1981, was thirty years old when he filed for disability.  (R. 54,

100.)  From 2001 until February 2006, Molina worked as a security guard, which required him to

sit for six hours, stand or walk for two hours, and crouch, kneel or crawl one hour daily.  (R. 137-

38.)  The job did not require any lifting.  (R. 138.)  In February 2006, Molina was fired for "getting

sick on the job with headaches, vomiting and dizzy spells."  (R. 136.)

Molina lives with his mother, who prepares all of his meals.  (R. 101, 145.)  Molina

reported that he needs help with daily chores including "ironing, cleaning, and laundry."  (R. 146.)

Molina goes shopping once a month for "clothes, underwear, [and] deodorant" when someone

accompanies him to a store.  (R. 147.)  Molina spends most of his days in his room, but he takes

"short walks" in the park three times a month.  (R. 144, 148.)  Molina listed "reading" as his only

hobby, but he often has to stop "due to pain."  (R. 147, 150.)

Molina sees a therapist once a week, and a psychiatrist once a month, with additional

scheduled appointments.  (R. 37.)  Molina testified that he is on prescription medication for seizures,

depression, pain, and psychotic episodes. (R. 35, 37-38, 41, 139.) Molina said that he has problems with his memory and has to be reminded to take his medication. (R. 145.)

Molina has trouble sleeping due to back and joint pain. (R. 41, 144.) Molina can walk about two blocks before having to stop and rest, because of his asthma. (R. 36, 150.) Molina claims that his lower back pain and leg pain affect his ability to stand, sit, walk, lift, kneel and squat. (R. 148-49.) Molina also claims to have headaches six times a week that are not relieved by medication. (R. 151-52.) He said he has seizures, "[a] couple of times a month." (R. 34; see also R. 152-53.) Molina testified that he cannot stand for long periods because of ankle pain, and his knee hurts if he sits too long. (R. 35, 38-39.) Molina claims that by November 2010 his symptoms became severe to the point of precluding him from working at all. (R. 33, 136.)

**Medical Evidence**

### Treating Physician Dr. Babu Patel

Dr. Babu Patel was Molina's primary physician from January 29, 2009 through March 14, 2011. (R. 212-44.) Dr. Patel diagnosed Molina with epilepsy and asthma. (R. 213, 223, 225-26, 228, 231, 233, 235, 237, 239, 242, 243.)

On February 5, 2009, Molina complained of back pain (which he rated as 8 out of 10) with no history of trauma or injury. (R. 213-14; see also R. 215, 233, 235-37, 239-40, 242, 244.)

On March 19, 2009, Dr. Patel concluded that Molina suffered from visual disturbances. (R. 216-17.) On July 14, 2009, Molina complained of a "history of headache[s]," and Dr. Patel prescribed 400 mg ibuprofen tablets. (R. 222-23; see also R. 224-25.) In subsequent visits in late 2010 and 2011, however, Dr. Patel noted that Molina "[d]enies headache." (R. 234, 238, 240.)

In March 2010, Dr. Patel diagnosed Molina with osteoarthritis after finding "moderate tenderness around the left knee," inability "to fully extend the left knee," and "decreased function and ability to tolerated weight bearing activities." (R. 225-26.) Dr. Patel recommended "continued physical therapy" in order to "improve . . . over-all function." (R. 225.) In subsequent visits, Dr. Patel reported no physical indications of back or knee problems:

> Extremities: No deformity/clubbing/cyanosis/edema; Bilateral pedal pulse present; No visible joint swelling/erythema; Normal ROM [range of motion].

(R. 227 (3/9/10); see R. 229 (4/12/10), 230 (5/3/10), 231 (6/28/10), 232 (7/26/10), 235 (11/8/10), 239 (2/14/11), 241 (2/23/11), 243 (3/11/11).) Indeed, on several occasions, Dr. Patel's notes indicate that as to muscular-skeletal issues, Molina "[d]enies joint pain, swelling, muscle weakness, unilateral deficits, or fatigue." (R. 234 (11/8/10), 236 (2/14/11), 240 (2/23/11).)

On March 12, 2010, Dr. Patel referred Molina to neurologist Dr. Sana L. Bloch. (R. 251.)

### Neurologist Dr. Sana L. Bloch

After an initial assessment on May 10, 2010, neurologist Dr. Bloch ordered an MRI and an EEG and prescribed Depakote to treat Molina's seizure disorder. (R. 253-54.) Dr. Bloch noted that Molina "averages three seizures a year," and that they "usually occur at night." (R. 253.) The May 17, 2010 EEG "did not show any evidence of seizure activity." (R. 258-61.) The MRI was unremarkable except for a slightly deviated septum and some chronic pansinusitis. (R. 258-61.) Dr. Bloch noted that the symptoms illuminated through the MRI and EEG were "not something that should be giving [Molina] severe headaches." (R. 258.) However, Dr. Bloch continued to prescribe Molina Depakote for his seizures and headaches. (R. 258.) By July 2010, "Molina's headaches

[were] not that much better with Depakote but he is tolerating it well," so Dr. Bloch was going to increase the dosage.  (R. 255.)  That was Molina's last visit with Dr. Bloch.

### Morris Heights Health Center

### Social Worker Charles Colclough

On September 13, 2010, Molina began receiving medical care from the Morris Heights Health Center for Behavioral Health.  (R. 263-87.)  Social Worker Charles Colclough evaluated Molina upon his arrival.  (R. 274-75.)  Based on Molina's complaints (e.g., R. 280), Colclough preliminarily diagnosed Molina with major depression with psychotic features, seizures and asthma, and relationship problems (R. 276-82).  Colclough found Molina's mood to be anxious, but his affect was normal as was his thought process; his intelligence was average, but his memory was limited and his judgment, insight and impulse control were poor.  (R. 281.)  Colclough recommended that Molina attend individual psychotherapy sessions once a week.  (R. 282.)

### Treating Psychiatrist Dr. Richard Frenkel

Morris Heights Health Center psychiatrist Dr. Richard Frenkel saw Molina for 60 minutes on November 29, 2010 and diagnosed Molina with depression, asthma, seizures, and headaches.  (R. 285-87.)  He found Molina's memory and intelligence were average, while his insight, judgment and impulse control were fair.  (R. 287.)

On January 20, 2011, Dr. Frenkel saw Molina for twenty minutes.  (R. 284.)  He found Molina's mood to be euthymic, his affect appropriate, his thought process coherent, thought content intact, and insight and judgment good.  (R. 284.)

In a July 7, 2011 Disability Questionnaire (R. 326-31), Dr. Frenkel reported that Molina's ability to do work related mental activities was "[n]ot good at this point" (R. 329).  Dr. Frenkel also concluded that Molina's abilities to concentrate, interact with others and adapt to

changes in a work setting were "[l]imited." (R. 330.) Dr. Frenkel also reported that Molina's

memory, insight and judgment were limited and that Molina had problems interacting with others.

(R. 328-30.)

Dr. Frenkel's January 2012 response to the "Mental Medical Source Statement

Questionnaire" (R. 335-39) indicated that Molina had "[m]arked" difficulties in maintaining social

functioning as well as "[m]arked" deficiencies of concentration (R. 336). Dr. Frenkel reported that

Molina had "[m]oderate" limitations as to daily living activities. (R. 336.) Dr. Frenkel also

indicated that Molina had three "[r]epeated episodes of decompensation [w]ithin [a] 12 month

period, each of at least [t]wo weeks duration." (R. 336.) Dr. Frenkel anticipated Molina's health to

cause absences from work "more than four days per month." (R. 338.) Dr. Frenkel found Molina's

prognosis to be "[g]uarded." (R. 335.) Dr. Frenkel explained that Molina "experiences [a]uditory

[and v]isual hallucinations which is [c]onsistent with his diagnosis." (R. 338.)[1/]

### Consultative Examinations

#### Dr. Herb Meadow

On May 18, 2011, psychiatrist Dr. Herb Meadow consultatively examined Molina.

(R. 295-98.) Dr. Meadow diagnosed Molina with bipolar disorder, panic disorder, cognitive

disorder, seizure disorder, asthma and back pain. (R. 297.) Dr. Meadow described Molina as

"cooperative" with an "adequate" manner of relating, "[c]oherent and goal directed" thought process

and "[f]luent and clear" in his speech. (R. 296.) Dr. Meadow reported that Molina's concentration

was "[i]mpaired due to limited intellect" but that Molina's memory was "[i]ntact" and that Molina

---

[1/]     By letter dated July 25, 2013, social worker Colclough informed the Court that Molina is
being seen on a weekly basis for "Major Depression with psychotic features." (Dkt. No. 4:
Am. Compl. Att. at p. 11: 7/25/13 Letter.)

"was able to repeat 3 out of 3 objects immediately and 2 out of 3 objects after five minutes."  (R. 296-97.)   Dr. Meadow further noted below average cognitive function with fair insight and judgment.  (R. 297.)   Dr. Meadow concluded that the results of Molina's exam "appear to be consistent with psychiatric and cognitive problems, but in itself does not appear to be significant enough to interfere with [Molina's] ability to function on a daily basis."  (R. 297.)   Dr. Meadow recommended that Molina "[c]ontinue in psychiatric treatment," but that Molina "would be able to perform all tasks necessary for vocational functioning."  (R. 297.)

### Dr. Marilee Mescon

On May 18, 2011, Dr. Marilee Mescon consultatively examined Molina.  (R. 299-303.)  Dr. Mescon reported that Molina "appeared to be in no acute distress" with a normal gait, no difficulty in walking on his heals and toes, and normal stance.  (R. 301.)  Molina needed "no help changing for [the] exam or getting on and off [the] exam table."  (R. 301.)  Molina was able to rise from a chair without difficulty.  (R. 301.)  Moreover, Dr. Mescon reported that Molina's cervical and lumbar spines showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (R. 302.)  Dr. Mescon found "[n]o scoliosis, kyphosis, or abnormality in [Molina's] thoracic spine."  (R. 302.)  Dr. Mescon concluded that Molina (1) had no limitations in his ability to sit or to stand for short periods of time, (2) should not operate heavy machinery, drive motor vehicles, or work in environments where he is exposed to heights because of his history of seizures; and (3) had moderate to severe limitations to sit or to stand for long periods of time "because of his knee and back pain."  (R. 303.)  Dr. Mescon further recommended that Molina avoid "toxic dust, chemicals, or fumes" in his work environment, citing Molina's asthmatic history.  (R. 303.)

### Evaluation of Medical History by Psychologist Dr. T. Harding and S. Peterson

On June 2, 2011, psychologist Dr. T. Harding performed a psychiatric review of Molina's medical records. (R. 304-17.) Dr. Harding indicated that Molina's impairments were "[n]ot [s]evere" under sections 12.02 Organic Mental Disorders, 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. (R. 304.)

On June 3, 2011, S. Peterson completed a physical residual functional capacity assessment of Molina. (R. 318-23.) Peterson identified himself as a "[s]ingle [d]ecision [m]aker" rather than a "[m]edical [c]onsultant." (R. 323.) After reviewing Molina's medical records, including the examinations by Dr. Meadow and Dr. Mescon, Peterson found that Molina could sit or stand for six hours in an eight hour workday and had no postural limitations. (R. 319-20.) Peterson concluded that Molina "retain[ed] the capacity to perform medium work in a hazard free environment with atmospheric limitations." (R. 323.)

### Vocational Expert Testimony

Vocational expert Karen Simone testified at Molina's hearing before ALJ Borda on March 14, 2012. (R. 42-52.) Vocational expert Simone testified that she was familiar with the national and regional job market, as well as Molina's past work as a security guard. (R. 44.) ALJ Borda asked four hypothetical questions about whether work existed in significant numbers in the national economy. (R. 44-52.)

In the first hypothetical question, ALJ Borda asked vocational expert Simone to "assume a person of the claimant's age, education, and work experience who can do light work." (R. 44.) The person in the first hypothetical also "would need to alternate sitting or standing positions at one hour intervals throughout the work day." (R. 44.) ALJ Borda further specified that the person could "climb . . . on an occasional basis" and "stoop, kneel, crouch, and crawl on a

frequent basis."  (R. 44-45.)  The person must avoid "driving or operating motor vehicles" and "exposure to hazardous machinery and unprotected heights."  (R. 45.)  The work needed to be "simple, routine, and repetitive," "low stress," with "only occasional changes in the work setting."  (R. 45.)  The person in the first hypothetical would "be allowed off task five percent of the day in addition to regularly scheduled breaks."  (R. 45.)  Finally, the person in the first hypothetical only could have "occasional interaction" with his or her co-workers and the public.  (R. 45.)  Vocational expert Simone responded that the person in the first hypothetical could not perform Molina's past job of a security guard because the job is neither "low stress" nor "simple and routine."  (R. 45.)  Simone also pointed out that "he probably can't sit and stand in one hour intervals in that position."  (R. 45.)  Simone concluded that no work existed in the national or regional economy that a person matching the criteria from the first hypothetical could perform.  (R. 46.)  According to Simone, this is because jobs that allow workers to have a "sit/stand option" also "typically require frequent contact with co-workers or the public."  (R. 46.)

Next, ALJ Borda presented a second hypothetical which "eliminate[d] the sit/stand option," but kept all other aspects of the first hypothetical the same.  (R. 46.)  Vocational expert Simone testified that the jobs of "housekeeping cleaner," "ironer," and "mail clerk, not in a post office" were all available under the restrictions in the second hypothetical.  (R. 46-47.)

Third, ALJ Borda asked the vocational expert to assume the restrictions to be the "[s]ame as hypothetical question number two," but to increase the percentage of the work day spent off task to ten percent.  (R. 47.)  Vocational expert Simone testified that the same positions (i.e. housekeeping cleaner, ironer, and mail clerk) still would be available in significant numbers in the national economy.  (R. 47.)

Lastly, ALJ Borda asked the vocational expert to consider a hypothetical identical to the third hypothetical, but in which "this person would be expected to be absent from work four days per month."  (R. 48.)  Vocational expert Simone testified that there would be no work in the national economy for someone meeting the restrictions under the fourth hypothetical.  (R. 48.)

**ALJ Borda's Decision**

On April 24, 2012, ALJ Borda issued a written decision denying Molina's application for SSI benefits.  (R. 9-21.)

ALJ Borda applied the appropriate five-step legal analysis.  (R. 12-21.)  First, ALJ Borda found that Molina "ha[d] not engaged in substantial gainful activity since March 21, 2011, the application date."  (R. 14.)  Second, ALJ Borda found that Molina had the severe impairments of "major depression disorder with psychotic features; panic disorder; cognitive disorder; seizure disorder; asthma; back pain; chronic headaches; and right knee pain."  (R. 14.)  Third, ALJ Borda found that Molina did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (R. 14-15.)  ALJ Borda determined that Molina "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except  [that] he can occasionally climb . . . and frequently stoop, kneel, crouch or crawl," but must avoid heavy machinery or driving, the tasks must be simple and repetitive and have only occasional interaction with the public or co-workers, and Molina must be allowed off task 10% of the workday.  (R. 16.)

In making this determination, ALJ Borda gave "[g]reat weight" to the medical opinions of Dr. Meadow and Dr. Mescon, despite their consultative status, because they both examined Molina in person.  (R. 18.)  ALJ Borda gave "[l]ittle weight" to Dr. Frenkel "despite the fact that he is [Molina's] treating physician" because Dr. Frenkel's opinion was "inconsistent with the medical evidence as a whole and not supported by acceptable diagnostic findings."  (R. 18.)  ALJ

Borda also explained that Dr. Frenkel's comment that Molina's ability to perform work related mental activities was "not good at this point" was not entitled to greater weight because it "lack[ed] specificity." (R. 18.) ALJ Borda also gave "[l]ittle weight" to Dr. Harding's opinion because his opinion was "inconsistent with the medical evidence as a whole" and particularly with Dr. Meadow's findings. (R. 18-19.) In crediting Dr. Meadow's findings over Dr. Harding's, ALJ Borda emphasized that unlike Dr. Harding, Dr. Meadow had the chance to examine Molina "in-person as well as [having] access to the file." (R. 18-19.) Finally, ALJ Borda gave no weight to S. Peterson's evaluation of Molina's medical records because Peterson did not identify himself as a medical professional and did not examine Molina in person. (R. 19, 28.)

ALJ Borda made a credibility determination about Molina's subjective pain allegations, finding Molina's "statements concerning the intensity, persistence and limiting effects" of his impairments "not credible to the extent they are inconsistent with [Molina's] residual functional capacity assessment." (R. 16-17.) ALJ Borda supported his credibility finding with inconsistencies in Molina's statements regarding the severity of his impairments. (R. 18.)

ALJ Borda determined that Molina "must avoid all exposure to hazardous machinery or unprotected heights and avoid driving motor vehicles." (R. 16.) Molina's work "must be limited to simple, routine and repetitive tasks" and he "must be allowed off task 10% of the workday in addition to regular breaks." (R. 16.) Finally, ALJ Borda found that Molina "is limited to only occasional interaction with the public or with co-workers." (R. 16.)

At the fourth step, ALJ Borda concluded that Molina is "unable to perform" his past work as a security guard. (R. 19.) At the fifth and final step, ALJ Borda found that, "[c]onsidering [Molina's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Molina] can perform," such as housekeeping

cleaner, ironer and mail clerk.  (R. 20.)  Therefore, ALJ Borda concluded that Molina was not "under a disability, as defined in the Social Security Act, since March 21, 2011, the date the application was filed (20 CFR 416.920(g))."  (R. 20.)

**The Appeals Council**

In a February 25, 2013 submission, Molina's representative asserted that ALJ Borda erred by: (a) failing to consider that Molina's education was in a "special education" program, (b) failing to schedule an IQ exam for Molina, (c) finding that Molina needed to be off task 10% of the time rather than 25-50% of the time, and (d) crediting the consultative doctors over treating psychiatrist Dr. Frenkel.  (R. 209-10.)  The Appeals Council denied review on June 14, 2013.  (R. 1-5.)

## ANALYSIS

### I.     THE APPLICABLE LAW

#### A.     Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[2]

---

[2]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15,
(continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[3/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[4/]

---

[2/]   (...continued)
16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[3/]   See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[4/]   See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

**B.**     **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[5/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[6/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

---

[5/]     See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[6/]     See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

Apfel, 167 F.3d at 773-74.[7/]  "[F]actual issues need not have been resolved by the [Commissioner]

in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The

Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if

it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949

F.2d 57, 59 (2d Cir. 1991).[8/]

The Court, however, will not defer to the Commissioner's determination if it is "'the

product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated
> regulations establishing a five-step sequential evaluation process to determine
> disability.  If at any step a finding of disability or non-disability can be made, the
> SSA will not review the claim further.  [1] At the first step, the agency will find
> nondisability unless the claimant shows that he is not working at a "substantial
> gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant

---

[7/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184;
Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v.
Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel,
174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[8/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312
F.3d at 586.

shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[9/]

        The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[10/]

---

[9/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[10/]  See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

C.        **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[11/]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[11/]      See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v.

Barnhart, 157 F. App'x at 346-47;  Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d

at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[12/]

      When a treating physician provides a favorable report, the claimant "is entitled to an

express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's]

favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an

explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g.,

Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's

failure to consider favorable treating physician evidence ordinarily requires remand pursuant to

Snell but does not require remand where the report was "essentially duplicative of evidence

considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do

not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do

believe that the crucial factors in any determination must be set forth with sufficient specificity to

enable [reviewing courts] to decide whether the determination is supported by substantial evidence."

(citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May

6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the

reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide

whether his determination is supported by substantial evidence.'").

      The Commissioner's "treating physician" regulations were approved by the Second

Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

---

[12/]    See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

### D.    The ALJ's Duty to Develop the Record

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the

record:

> [I]t is the well-established rule in our circuit "that the social security ALJ,
> unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the
> record in light of the essentially non-adversarial nature of a benefits proceeding."
> Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal
> quotation marks and brackets omitted)[, cert. denied, 559 U.S. 962, 130 S. Ct. 1503
> (2010)]; accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on
> other grounds], 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir.
> 1996); see also Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir.
> 1972) (pro se claimant).  Social Security disability determinations are "investigatory,
> or inquisitorial, rather than adversarial."  Butts, 388 F.3d at 386 (internal quotation
> marks omitted).  "[I]t is the ALJ's duty to investigate and develop the facts and
> develop the arguments both for and against the granting of benefits."  Id. (internal
> quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[13/]  This duty is heightened when a claimant

proceeds pro se.  See, e.g., Moran v. Astrue, 569 F.3d at 113; Hamilton v. Colvin, 10 Civ. 9641,

2013 WL 3814291 at *13 (S.D.N.Y. July 23, 2013).

## II.    APPLICATION OF THE FIVE-STEP SEQUENCE TO MOLINA'S CLAIM

### A.    Molina Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Molina was engaged in substantial gainful activity after

his application for SSI benefits.  "Substantial gainful activity" is defined as work that involves

"doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or

profit."  20 C.F.R. § 404.1510.  Since ALJ Borda's conclusion that Molina did not engage in

---

[13/]    See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d),
416.912(e)(2); Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013); Winn v. Colvin, 541
F. App'x 67, 70 (2d Cir. 2013); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez
v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685
F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9
(S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

substantial gainful activity during the applicable time period (see page 10 above) is uncontested (see

R. 209-10; Dkt. No. 21: Gov't Br. at 12), the Court proceeds to the second step of the five-step

analysis.

### B.    Molina Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Molina proved that he had

a severe impairment or combination of impairments that "significantly limit[ed his] physical or

mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work

activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §

404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling
> . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and
> remembering simple instructions . . . [u]se of judgment . . . [r]esponding
> appropriately to supervision, co-workers and usual work situations . . . [d]ealing with
> changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not

do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed

or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"

McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report

& rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[14]

---

[14]    Accord, e.g., Whiting v. Astrue, No. Civ. A. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan.
15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to
establish disability; instead, it is the impact of the disease, and in particular any limitations
it may impose upon the claimant's ability to perform basic work functions, that is pivotal to
the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013);
Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011),
(continued...)

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Borda determined that the medical evidence indicated that Molina had the severe impairments of major depression disorder with psychotic features, panic disorder, cognitive disorder, seizure disorder, asthma, back pain, chronic headaches, and right knee pain. (R. 14; see page 10 above.) ALJ Borda's finding regarding the severity of Molina's impairments also is uncontested (see R. 209-10; Dkt. No. 21: Gov't Br. at 12), and the Court therefore proceeds to the third step of the five-part analysis.

---

[14]/     (...continued)
aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.' Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

**C.     ALJ Borda's Finding That Molina Did Not Have A Disability Listed In Appendix 1 Of The Regulations Is Supported By Substantial Evidence**

The third step of the five-step test requires a determination of whether Molina had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

As to Molina's mental impairments, ALJ Borda evaluated Molina against the criteria in Listing 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders) and Listing 12.06 (Anxiety Related Disorders).  (R. 14-15.)  ALJ Borda found that "[t]he severity of [Molina's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06."  (R. 14; see page 10 above.)  In order to qualify for a disability, Molina's depression, panic, and cognitive disorders must qualify as organic mental, affective, or anxiety related disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04, 12.06.  Molina's representative argued before ALJ Borda that Molina satisfied listing § 12.04 (R. 199-200), and the Court therefore considers only that listing.[15/]

Section 12.04 defines affective disorder, as an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

---

[15/]     Molina has not submitted any opposition to the Government's motion for judgment on the pleadings.  It appears that it is uncontested that Molina physical, as opposed to mental, impairments do not satisfy any listing.  (See R. 199-200; Dkt. No. 21: Gov't Br. at 12.)

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities; or

b.  Appetite disturbance with change in weight; or

c.  Sleep disturbance; or

d.  Psychomotor agitation or retardation; or

e.  Decreased energy; or

f.  Feelings of guilt or worthlessness; or

g.  Difficulty concentrating or thinking; or

h.  Thoughts of suicide; or

I.  Hallucinations, delusions, or paranoid thinking; or

2.  Manic syndrome . . . :

. . .

or

3.  Bipolar syndrome . . . ;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Since ALJ Borda found that Molina suffers from major depression disorder with psychotic features, panic disorder and cognitive disorder (R. 14; see page 10 above), presumably ALJ Borda found that Molina satisfied § 12.04(A).

With regard to the B criteria, however, ALJ Borda found that Molina's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (R. 15.)  Specifically, ALJ Borda determined that Molina had only mild restriction in activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence or pace, but "sufficient attention and concentration to use public transportation, read, follow written and spoken instructions, and shop," and no episodes of decompensation of extended duration.  (R. 15.)  ALJ Borda also determined that although "the evidence in the record suggests that . . . [Molina's] functioning is limited in some ways, it is not restricted to the level required to meet the 'C' criteria for any of the considered listings."  (R. 15.)  In determining that Molina does not fit the paragraph C criteria, ALJ Borda found

that although Molina lives with and is supported by his mother, "[t]here is no evidence that [Molina] has had any difficulty with functioning outside his home, any episodes of decompensation, or any indication that he requires a highly supportive living arrangement in which to function."  (R. 15.)

ALJ Borda's findings are supported by the objective medical evidence.  ALJ Borda properly relied on the reports from consultative examiner Dr. Meadow.  (R. 18.)  Dr. Meadow evaluated Molina in person, and found that Molina's thought process was coherent and goal-directed, with intact memory.  (See pages 6-7 above.)   While Dr. Meadow noted that the results of the exam "appear to be consistent with psychiatric and cognitive problems," he concluded that the problems "do[] not appear to be significant enough to interfere with [Molina's] ability to function on a daily basis."  (R. 297; see page 7 above.)  Dr. Meadow concluded that Molina "would be able to perform all tasks necessary for vocational functioning."  (R. 297; see page 7 above.)  Although treating psychiatrist Dr. Frenkel's Questionnaire response indicated marked limitations sufficient to satisfy the Paragraph B criteria (R. 336), ALJ Borda properly rejected these findings as both inconsistent with Dr. Meadow's evaluation and unsupported by any other evidence in the record (R. 15).  As to the Paragraph C criteria, ALJ Borda's determination is supported by Molina's own statements that "he is capable of performing activities related to personal care, like feeding, bathing and dressing himself; he travels by walking and using public transportation; [and] he does shop when necessary," indicating his ability to function outside of a highly supportive living arrangement and to adjust to the demands of daily activities.  (R. 18; see page 11 above.)

Accordingly, substantial evidence supports ALJ Borda's determination that Molina's mental impairments did not satisfy the listing requirements.  See, e.g., Perez v. Colvin, 13 Civ. 3713, 2014 WL 2462992 at *18 (S.D.N.Y. June 2, 2014) (Peck, M.J.); Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *15-16 (S.D.N.Y. May 13, 2014) (Peck, M.J.); Paulino v. Astrue, 08 Civ.

2813, 2010 WL 3001752 at *20-21 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 listing requirements where review psychologist determined claimant "had moderate difficulties in maintaining concentration, but only mild restriction of daily activities and mild difficulties in maintaining social functioning" and where claimant "testified that she can feed, bathe, and dress herself, and use certain forms of transportation independently"); Rosado v. Astrue, 713 F. Supp. 2d 347, 364 (S.D.N.Y. 2010) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where psychiatrist noted claimant's independence and claimant's "own testimony and actions demonstrate his ability to function independently outside the area of his home"); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *20-21 (S.D.N.Y. July 2, 2008) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where doctor noted claimant "had no restrictions of activities of daily living" or "social functioning," and where claimant testified that she cooks, shops, "helps her children with their homework," and uses public transportation, which showed she "could function independently outside the area of her home"), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008).

Before proceeding to step four, however, the Court will address ALJ Borda's credibility and residual functional capacity ("RFC") determinations.

## 1.   Credibility and RFC Determinations

Because subjective symptoms like pain only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824,

2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell

v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an

ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she

is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ

'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010)

("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and

other limitations into account, but is not required to accept the claimant's subjective complaints

without question; he may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310

F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the

ALJ must make credibility findings.").[16/]  In addition, "courts must show special deference to an

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor

_____

[16/]   See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v.
Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's
"description of her symptoms was at odds with her treatment history, her medication regime
and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue,
912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner]
to evaluate the credibility of plaintiff's complaints and render an independent judgment in
light of the medical findings and other evidence regarding the true extent of such
symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12
(W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain
complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-
3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26,  2008) ("The ALJ 'does not have to
accept plaintiff's subjective testimony about her symptoms without question' and should
determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ.
7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the
discretion to evaluate the credibility of a claimant and to arrive at an independent judgment,
in light of medical findings and other evidence, regarding the true extent of pain alleged by
the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

while [the plaintiff was] testifying."  Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7

(S.D.N.Y. Oct. 9, 2013).[17]

ALJ Borda considered Molina's "symptoms and the extent to which these symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence,"

and determined that Molina's "medically determinable impairments could reasonably be expected

to cause the alleged symptoms; however, [Molina's] statements concerning the intensity, persistence

and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

[ALJ's] residual functional capacity assessment."  (R. 16-17.)  ALJ Borda found Molina "to be

partially credible."  (R. 17.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific

reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p,

1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a

claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged. . . . If the claimant does suffer from such an impairment, at the second step,
> the ALJ must consider the extent to which the claimant's symptoms can reasonably
> be accepted as consistent with the objective medical evidence and other evidence of
> record.  The ALJ must consider statements the claimant or others make about his
> impairments, his restrictions, his daily activities, his efforts to work, or any other
> relevant statements he makes to medical sources during the course of examination

---

[17]   Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the
function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses,
including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7
(S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7
(S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7
(S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y.
1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.);
Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977)
(Weinfeld D.J.).

or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[18/]

ALJ Borda accurately explained this two-step process, but failed to properly apply it to Molina. (R. 16.) First, ALJ Borda essentially reversed the standard by finding that Molina was not credible because Molina's complaints were not compatible with ALJ Borda's own RFC determination, as opposed to the objective record evidence. (R. 16-17.)[19/] Neither the Social Security regulations nor this Circuit's caselaw support the idea that an ALJ may discredit a claimant's subjective complaints on the basis of the ALJ's own finding of the claimant's RFC. See, e.g., Caternolo v. Astrue, No. 11-CV-6601, 2013 WL 1819264 at *11-12 (W.D.N.Y. Apr. 29, 2013) (citing Bjornson v. Astrue, 671 F.3d at 645); Perrin v. Astrue, 2012 WL 4793543 at *5 ("[I]t was

---

[18/]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

[19/]   This boilerplate language about the claimant's subjective complaints being "inconsistent with the above residual functional capacity assessment" has begun to appear in many ALJ decisions. See, e.g., Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); Ocasio v. Colvin, No. 12-CV-6002, 2013 WL 1395846 at *8 n.22 (E.D.N.Y. Apr. 5, 2013); Otero v. Colvin, No. 12-CV-4757, 2013 WL 1148769 at *7 (E.D.N.Y. Mar. 19, 2013); Perrin v. Astrue, No. 11-CV-5110, 2012 WL 4793543 at *5 (E.D.N.Y. Oct. 9, 2012); Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123 at *10 (E.D.N.Y. Sept. 1, 2011); Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148 at *5 (E.D.N.Y. Mar. 31, 2011).

This same boilerplate language also appeared in ALJ decisions reviewed in Perez v. Colvin, 13 Civ. 3713, 2014 WL 2462992 at *19 n.26 (S.D.N.Y. June 2, 2014) (Peck, M.J.), Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *17 n.18 (S.D.N.Y. May 13, 2014), and Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.). In those cases, the Court found it to be "harmless error" because the ALJs gave sufficient explanations for their credibility findings, which is missing here.

error for the ALJ to discount [claimant's] complaints because they conflicted with the ALJ's residual functional capacity assessment."); <u>Smollins</u> v. <u>Astrue</u>, 2011 WL 3857123 at *11 ("Instead of comparing [the claimant's] symptoms, as described by [the claimant] herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the] ALJ . . . merely compared [the claimant's] statements regarding her symptoms to his own RFC assessment. . . . [The] ALJ . . . failed to follow the dictates of the Social Security regulations in performing his credibility assessment."); <u>Mantovani</u> v. <u>Astrue</u>, 2011 WL 1304148 at *5 ("[T]he ALJ found that Plaintiff's 'medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.' . . . This failure to comply with the regulatory requirements for evaluating Plaintiff's credibility also requires remand.").

The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his symptoms are discarded if they are not compatible with an RFC that has been pre-determined based on other factors. <u>See</u>, <u>e.g.</u>, <u>Otero</u> v. <u>Colvin</u>, 2013 WL 1148769 at *7 ("The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms. Thus, it makes little sense to decide on a claimant's RFC prior to assessing her credibility."); <u>Smollins</u> v. <u>Astrue</u>, 2011 WL 3857123 at *11 (finding such reasoning "flawed not only in its brevity, but also in its acceptance as a foregone conclusion of [the claimant's] capacity to perform sedentary work"). In order to take proper account of the claimant's symptoms, the ALJ should first determine the extent to which the claimant's symptoms are credible in light of the objective record evidence, and then use that finding as one aspect of the RFC analysis. Determining the RFC first and then measuring the

claimant's credibility by that yardstick reverses the standard in a way that is not only illogical, but also prejudicial to the claimant.  See, e.g., Cruz v. Colvin, 2013 WL 3333040 at *16 (& cases cited therein).

Second, ALJ Borda not only improperly reversed this two-step process, but in finding Molina "partially credible," did not explain in what way Molina was and was not credible and how that impacted Molina's RFC.  As to Molina's mental ailments, ALJ Borda specifically pointed to the discrepancy between Molina's uncorroborated accounts of seizures and the EEG which "was normal and failed to yield any evidence of seizure activity."  (R. 17.)  While Molina testified during the hearing that he had seizures "[a] couple of times a month," he had previously told Dr. Mescon that he usually gets ten to twelve seizures per month.  (R. 18; see R. 34, 299.)  Moreover, treating physician Dr. Bloch reported that Molina "averages three seizures a year" that "usually occur at night."  (See page 4 above; see also R. 18.)  Molina denied ever having an MRI or EEG, and then admitted to having both tests within the same questionnaire.  (R. 18, 151-52.)  Molina claimed to have hallucinations four days out of every week, but no medical evidence on record substantiated Molina's claim that the hallucinations are happening with that frequency.  (R. 18.)  Molina also testified that he did not have any limitations on how much he could lift, despite alleging severe back and knee problems.  (R. 18, 38.)

Additionally, ALJ Borda weighed Molina's claim that he is unable to perform activities required for work against the fact that Molina admitted to performing several activities related to personal care on a regular basis.  (R. 17-18.)  ALJ Borda noted that Molina feeds, bathes and dresses himself.  (R. 18.)  Molina, albeit infrequently, also walks and uses public transportation, and shops when necessary.  (R. 18; see pages 2-3 above.)  There is a big difference, however, between an occasional walk or shopping trip and sitting / standing for an eight hour workday.  See,

e.g., Bialek v. Astrue, No. 11-CV-5220, 2013 WL 316165 at *4 (E.D.N.Y. Jan. 28, 2013) ("The ALJ stated that '[w]hile the claimant may very well have some degree of pain and limitation to his left leg/knee and low back, the evidence does not suggest a level of pain or limitations to preclude all work activity.'  In support of this credibility determination, the ALJ pointed only to the fact that [plaintiff] handles his personal needs and drives independently to appointments . . . . Although daily activities are a relevant consideration, [plaintiff's] ability to tend to his personal needs and travel to appointments is not indicative of his ability to perform light work.  Thus, this was an improper basis for discounting [plaintiff's] subjective complaints." (citations omitted)); Stringer v. Astrue, No. 10-CV-0575, 2012 WL 1952729 at *5 (N.D.N.Y. Apr. 25, 2012) ("The ALJ suggested that [a doctor's] opinion concerning Plaintiff's ability to sit limited Plaintiff more than her testimony and activities indicated.  Plaintiff testified that she could sit for 20 to 30 minutes at a time.  This testimony does not support a conclusion that Plaintiff could sit for prolonged periods through the course of a workday, as would be required to perform sedentary work, which generally involves 'six hours of sitting in an eight-hour workday.'  Further, the fact that Plaintiff engaged in some activities of daily living (some light housework, limited walking) does not preclude a finding of disability." (citations omitted)), report & rec. adopted, 2012 WL 1952300 (N.D.N.Y. May 30, 2012); Archambault v. Astrue, 09 Civ. 6363, 2010 WL 5829378 at *30 (S.D.N.Y. Dec. 13, 2010) ("The ALJ also remarked . . . that plaintiff's reported activities of daily living, which included self-care, childcare duties, a few household chores, and some pastimes, indicate that 'he is not debilitated.'  Plaintiff's ability to engage in certain limited daily activities does not provide evidence of his ability to perform [light] work unless he can perform those daily activities at a level consistent with the demands of [light] work.  As the ALJ failed to discuss the rigor of plaintiff's daily activities and presumed that those activities

demonstrated a lack of disability, she committed legal error." (citations omitted)), report & rec. adopted, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).

ALJ Borda's finding that Molina only was partially credible is to a certain extent supported by the objective medical evidence.  See, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . .  where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Givens v. Colvin, 2014 WL 1394965 at *10-11 (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Crayton v. Astrue, 944 F. Supp. 2d 231, 235 (W.D.N.Y. 2013) ("Plaintiff also challenges the ALJ's finding that plaintiff's complaints of disabling pain were not wholly credible. . . . Here, the ALJ rejected plaintiff's testimony based on several inconsistencies. . . . [P]laintiff's complaints of disabling pain appear to conflict with her medical treatment records, which reflect few complaints and no aggressive or additional treatment for back, knee and wrist pain . . . . For example, plaintiff listed, among her activities of daily living, dressing and caring for herself, performing light housework and grocery shopping, and stated that she could lift ten pounds . . . . Given the inconsistencies between plaintiff's

reports of disabling pain, other testimony by plaintiff and the rest of the record, I find no basis to disturb the ALJ's findings as to plaintiff's credibility."); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

        This does not mean, however, that ALJ Borda did not err in making his RFC determination.  See Beller v. Astrue, 12 Civ. 5112, 2013 WL 2452168 at *17-19 (S.D.N.Y. June 5, 2013) (affirming the ALJ's credibility determination, but remanding the case for further reconsideration of the claimant's RFC); Cornell v. Astrue, 764 F. Supp. 2d 381, 398, 400, 405 (N.D.N.Y. 2010) (ALJ's credibility determination was supported by substantial evidence, but nevertheless remanding the case for an erroneous RFC determination where the ALJ failed to "recognize the combined effect" of the claimant's impairments).

        ALJ Borda erred by failing to explain how his partial credibility determination affected the residual functional capacity assessment (i.e., which of Molina's subjective complaints were discounted and which were accepted), particularly with respect to Molina's physical limitations, and that failure warrants remand.

        ALJ Borda determined that Molina "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)" (R. 16), which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b) (emphasis added).  ALJ Borda concluded that Molina "can occasionally climb ramps, stairs, ladders, ropes or scaffolds and frequently stoop, kneel,

crouch or crawl," but that Molina must avoid heavy machinery, heights, or driving, the work "must be limited to simple, routine and repetitive tasks," that Molina "must be allowed off task 10% of the workday in addition to regular breaks," and that he is only to have "occasional interaction with the public or with co-workers." (R. 16.)

With respect to Molina's seizures, ALJ Borda's RFC determination accounted for Molina's seizures by requiring that Molina "avoid driving motor vehicles," "hazardous machinery," and "unprotected heights." (R. 16; see page 10 above.)

As to Molina's asthma, treating physician Dr. Patel, treating psychiatrist Dr. Frenkel, and consultative examiners Dr. Meadow and Dr. Mescon all diagnosed Molina with asthma. (See pages 3, 5-7 above.) Dr. Mescon, whose opinion ALJ Borda assigned "great weight," recommended that Molina avoid "toxic dust, chemicals, or fumes" in his work environment. (R. 18; see page 7 above.) The ALJ failed to incorporate that restriction in his RFC determination (R. 16), and it is unclear whether the three occupations identified by the vocational expert would satisfy Dr. Mescon's RFC limitation.

With respect to Molina's claimed back and leg pain, ALJ Borda's analysis is even more troublesome. Molina testified that he cannot stand for long periods because of ankle pain, and his knee hurts if he sits too long. (See page 3 above.) Light work requires "a good deal of walking or standing," which encompasses six hours in an eight hour workday. See 20 C.F.R. § 416.967(b). In determining that Molina could perform light work, ALJ Borda assigned great weight to the opinion of consultative examiner Dr. Mescon because "she conducted a physical examination of [Molina] in person." (R. 18.) Dr. Mescon reported that Molina "appeared to be in no acute distress" with a normal gait, no difficulty in walking on his heals and toes and normal stance. (R. 301; see page 7 above.) Molina needed "no help changing for [the] exam or getting on and off [the] exam

table," and he was able to rise from a chair without difficulty. (R. 301; <u>see</u> page 7 above.) Dr. Mescon reported that Molina's cervical and lumbar spines showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 301; <u>see</u> page 7 above.) Dr. Mescon found "[n]o scoliosis, kyphosis, or abnormality in [Molina's] thoracic spine." (R. 301; <u>see</u> page 7 above.) ALJ Borda accepted Dr. Mescon's conclusions that Molina (1) had no limitations in his ability to sit or to stand for short periods of time, and (2) should not operate heavy machinery, drive motor vehicles, or work in environments where he is exposed to heights because of his history of seizures. (R. 18, 303; <u>see</u> pages 7, 11 above.) However, ALJ Borda does not appear to have accepted Dr. Mescon's conclusion that Molina had moderate to severe limitations in his ability to stand for long periods of time, which would prevent Molina from performing light work. (R. 303; <u>see</u> page 7 above.) This inconsistent use of Dr. Mescon's opinion, without any explanation by ALJ Borda, is insufficient to support his physical residual functional capacity assessment that Molina could perform light work. <u>See</u>, <u>e.g.</u>, <u>Beck</u> v. <u>Colvin</u>, No. 13-CV-6014, 2014 WL 1837611 at *13 (W.D.N.Y. May 8, 2014) ("The ALJ ignored the portions of [the doctor's] reports in which he strongly opines that if Plaintiff were placed in a full-time competitive work-environment, her depression and anxiety symptoms would worsen and she likely would decompensate. The ALJ improperly cherry-picked from [that doctor's] opinions only the information that purportedly favors a finding of no disability."); <u>Tim</u> v. <u>Colvin</u>, No. 12-cv-1761, 2014 WL 838080 at *7 (N.D.N.Y. Mar. 4, 2014) ("[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.").

As to Molina's mental impairments, ALJ Borda's residual functional capacity assessment allowed Molina be off task 10% of the time and limited his work to "simple, routine and repetitive tasks" with limited interaction with others. (R. 16; <u>see</u> page 11 above.) In reaching his

conclusion, ALJ Borda credited consultative examiner Dr. Meadow's opinion over that of treating psychiatrist Dr. Frenkel.  ALJ Borda assigned little weight to Dr. Frenkel's opinion because it was "inconsistent with the medical evidence as a whole and not supported by acceptable diagnostic findings."  (R. 18.)  Even though "the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[20]  Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner."  Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

ALJ Borda reasoned that although Dr. Frenkel "emphasize[d] the existence of auditory and visual hallucinations" that impeded Molina's ability to function, there was "no

---

[20]     Accord, e.g., Penfield v. Colvin, No. 13-2225-cv, --- F. App'x ----, 2014 WL 1673729 at *1 (2d Cir. Apr. 29, 2014); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as opinions of other medical experts.'").

indication in the medical record as to how frequent[ly] these hallucinations may occur." (R. 18; see pages 6, 10-11 above.) Dr. Frenkel only vaguely described Molina's ability to perform work-related mental activities as "not good at this point," without any further elaboration. (See pages 5, 11 above.) Moreover, Dr. Frenkel's Mental Medical Source Statement Questionnaire indicating that Molina suffered three two-week episodes of decompensation in the last year is the only evidence in the record of such episodes, and is not supported by Dr. Frenkel's (or any other) medical records. (R. 336; see page 6 above.)

By contrast, ALJ Borda assigned great weight to Dr. Meadow's opinion because Dr. Meadow personally examined Molina. (R. 18; see page 10 above.) Of course, so did Dr. Frenkel, and on several occasions. (See pages 5-6 above.) Dr. Meadow described Molina as "cooperative" with an "adequate" manner of relating, "[c]oherent and goal directed" thought process and "[f]luent and clear" in his speech. (R. 296; see page 6 above.) Dr. Meadow reported that Molina's concentration was "[i]mpaired due to limited intellect" but that Molina's memory was "[i]ntact" and that Molina "was able to repeat 3 out of 3 objects immediately and 2 out of 3 objects after five minutes." (R. 296-97; see pages 6-7 above.) Dr. Meadow further noted below average cognitive function with fair insight and judgment. (R. 297; see page 7 above.) In total, Dr. Meadow concluded that the results of Molina's exam "appear to be consistent with psychiatric and cognitive problems," but they do "not appear to be significant enough to interfere with [Molina's] ability to function on a daily basis." (R. 297; see page 7 above.) This evidence might be sufficient to support ALJ Borda's residual functional capacity determination as to Molina's mental impairments, but the Court need not and does not decide this issue in light of the need to remand because of the credibility and physical RFC issues discussed above.

Accordingly, a remand is necessary because it is unclear how ALJ Borda concluded that Molina could satisfy a residual functional capacity assessment of light work.  On remand, the ALJ should properly evaluate Molina's credibility and its effect on his residual functional capacity.[21/]

---

[21/]     Because a remand is necessary to properly determine Molina's residual functional capacity, the Court cannot proceed to steps four or five because the hypotheticals presented to the vocational expert assumed the ability to perform light work.  See, e.g., Calabrese v. Astrue, 358 F. App'x 274, 276 (2d Cir. 2009) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence . . . and accurately reflect the limitations and capabilities of the claimant involved." (citations omitted)); Rivera v. Colvin, 11 Civ. 7469, 2014 WL 2440718 at *39 (S.D.N.Y. May 30, 2014) (remanding and directing the ALJ "to ensure that all of Plaintiff's limitations are adequately reflected in the hypotheticals provided to the vocational expert"); Sanchez v. Astrue, No. 12CV258A, 2013 WL 886662 at *7 (W.D.N.Y. Feb. 14, 2013) ("Plaintiff concludes that the [vocational] expert's opinion relied upon by the ALJ (that jobs existed in the economy that plaintiff could perform) was not based upon his full condition and therefore the ALJ's finding needs to be vacated. . . . The ALJ noted that plaintiff was prescribed pain medication, but disregarded in the hypothetical the factor of the use of the pain medication and its side effects. . . . Here, there is substantial evidence of plaintiff's use of prescribed medication but the hypotheticals posed by the ALJ do not factor in use of these medicines and the consequences of their side effects on the ability of plaintiff to work without significant restriction." (record citations omitted)), report & rec. adopted, 2013 WL 886320 (W.D.N.Y. Mar. 8, 2013).

## **CONCLUSION**

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 20) is <u>DENIED</u> and the case is remanded to the Commissioner for further proceedings consistent with this Opinion.  The Clerk of Court shall enter judgment accordingly.[22/]

SO ORDERED.

Dated:      New York, New York
            July 15, 2014

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies to:      Juan P. Molina (Mail)
                AUSA Susan Baird (ECF)

---

[22/]      If Molina requires copies of any of the cases reported only in Westlaw, he should request copies from opposing counsel.  <u>See</u> <u>Lebron</u> v. <u>Sanders</u>, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.